**BLEVINS et al. v. HARRIS et al.**

No. 23846.   April 30, 1935.

Everest, McKenzie, Halley & Gibbens, for plaintiffs in error.

Ames, Cochran, Ames & Monnet, W. N.

Stokes, R. J. Price, and George W. Grant, for defendants in error.

OSBORN, V. C. J. This action was commenced in the district court of Oklahoma county by H. E. Harris and others against Millie E. Blevins, D. A. Laue, and Myrtle Laue for the purpose of fixing the proportionate share of oil royalties due the various parties from a producing oil well located on the land of defendants. Plaintiffs were the owners of adjoining land which had been placed in a drilling block with defendants' land by order of the board of adjustment of Oklahoma City. From a judgment in favor of plaintiffs, defendants have appealed. The parties will be referred to as they appeared in the trial court.

On October 8, 1929, Millie E. Blevins, D. A. Laue, and Myrtle Laue executed an oil and gas lease to T. B. Slick on a tract of land in section 10, twp. 11 north, range 3 west, consisting of approximately four acres.

The plaintiffs, H. E. Harris, Julia A. Harris, T. R. Harris, W. B. Hollis, Byrddie Hollis, M. M. Clark, Will H. Clark, R. K. Cox, O. A. Comer, Frances Comer, R. Schwint, D. A. Schwint, Alva H. Henderson, and Hattie Henderson, were the owners of seven small tracts of land adjoining plaintiffs' land. In May and June of 1930, defendants executed oil and gas leases on their property to E. S. Stahl, which were later assigned to Stahl Petroleum Company. These leases covered approximately 1.44 acres. V. J. Bodovitz was the owner of a one-eighth interest in the minerals in the land of M. M. Clark and Will H. Clark. All of the leases involved herein provided for the delivery to the lessors of one-eighth of all the oil produced and saved from the leased premises.

The property herein involved is within the limits of Oklahoma City and in the U-7 drilling zone, where drilling is regulated and restricted under the provisions of ordinance No. 3944 of the city of Oklahoma City.

T. B. Slick died, and on January 9, 1931, O. F. Urschel, Arthur A. Seeligson, and Bernice Slick were appointed trustees of his estate. The trustees of the Slick estate applied for a permit to drill a well on the property covered by the Slick lease. The building superintendent denied the permit, and an appeal was taken to the board of adjustment of Oklahoma City. Notice was served on all the parties interested, and

Stahl and his lessors appeared and protested the granting of the permit on the ground that the land covered by the Slick lease was less than 5 acres in area and that the property covered by the Stahl leases adjoining the property covered by applicant's lease amounted to 1.44 acres in area. They further contended that if a permit was granted to applicant, a permit should likewise be granted to drill a well on the Stahl tract, unless the several leases should be consolidated into one drilling block and the owners of the Stahl tract permitted to participate in the oil and gas produced from the well drilled thereon in the proportion which their acreage bears to the entire acreage in the drilling block.

On November 13, 1930, the board of adjustment ordered that the property covered by the Stahl leases and the Slick leases should be joined together as one drilling block and a permit should be issued to drill only one well on the entire block. Since the applicants' lease covered more than 51 per cent. of the entire area involved, the permit was granted to the trustees of the Slick estate. The board found that the drilling of a well at the location designated by the applicant would drain the entire area of the block as nearly equally as possible and at the same time equalize drainage against the adjoining offset wells. The board further ordered that all owners of the property covered by the leases owned by Stahl Petroleum Company and the estate of T. B. Slick should participate in the one-eighth royalty of all the oil, gas, and casing-head gas produced and saved from the well in the proportion which the area of the property owned by each property owner bears to the total area of the property included in the block. The board further ordered that the Stahl Petroleum Company should be permitted to participate in the seven-eighths working interest in all oil, gas, and casing-head gas produced and saved from the well in the proportion which the acreage covered by the leases owned by the Stahl Petroleum Company bears to the entire acreage included in the block, and that said company should pay its proportionate part of the drilling expenses and should post a bond with the estate of T. B. Slick to guarantee the payment of such expense. No appeal was taken from the order of the board of adjustment. Thereafter the Slick lease was transferred to Rodman Lease, Inc.

The defendants took the position that they were entitled to a full one-eighth roy-

alty on the oil produced from the well drilled on the block, and the purchaser of the oil, the Stanolind Company, refused to pay the lessors in the Stahl leases for any portion of the oil until the contention was settled between the parties; thereupon this action was instituted.

After the cause was tried to the trial court, certain findings of fact were made, among which is the following:

"The court further finds that there are 192,000 square feet in the drilling block fixed by the order of the board of adjustment, and Millie E. Blevins is the owner of 9,000 square feet, or 90/192 of the total area in said block; that D. A. Laue is the owner of 42,000 square feet, or 42/192 of the total area of said drilling block; that Millie E. Blevins is entitled to receive 90/192 of 1/8 of all of the oil, gas, and casing-head gas which has been and which shall be produced from said well; that D. A. Laue and Myrtle Laue are entitled to receive 42/192 of 1/8 of all the oil, gas, and casing-head gas which has been and which shall be produced from said well; that the plaintiffs and Stahl Petroleum Corporation and Rodman Lease, Inc., are entitled to receive the following proportionate part of all of the oil, gas, and casing-head gas which has been and shall be produced from said well, to wit: H. E. Harris, Julia A. Harris and T. R. Harris 8/192 of 1/8, W. V. Hollis and Byrddie Hollis 8/192 of 1/8, M. M. Clark and Will H. Clark 7/192 of 1/8, V. J. Bodovitz 1/192 of 1/8, R. K. Cox 8/192 of 1/8, A. O. Comer and Frances Comer 14/192 of 1/8, R. Schwint and D. A. Schwint 7/192 of 1/8, Alva H. Henderson and Hattie Henderson 7/192 of 1/8, Rodman Lease, Inc., 2/3 of 7/8, Stahl Petroleum Corporation 1/8 of 7/8."

Judgment was entered in accordance with the above findings, and the defendants have appealed to this court.

There is but one proposition presented and relied upon by defendants, which is stated in the brief as follows:

"That the judgment of the trial court was erroneous in holding that the plaintiffs were entitled to participate in the one-eighth royalty production from the well on the Blevins tract on the basis and in the ratio and proportion as set out in the judgment."

Ordinance No. 3944 of the city of Oklahoma City prohibits the drilling of more than one petroleum or gas well upon any one block or tract of less than five acres in area in unplatted tracts and provides that no such well shall be drilled upon any block of less than two and one-half acres in platted tracts. In cases where the permit is sought to drill upon unplatted tracts of less than five acres or in platted tracts of less than two and one-half acres the board of adjustment is given authority to attach contiguous or adjoining tracts for the purpose of creating a drilling block, and is directed by the terms of the ordinance to provide the pro rata or ratable basis on which said blocks or tracts shall participate in the said well or wells and to make any equitable order in relation thereto which may be proper in order that substantial justice may be done.

Defendants do not attack the constitutionality or validity of the ordinance, but they contend that in the administration, thereof the board of adjustment has violated their contractual rights; that under the terms of the lease contract they are entitled to the full one-eighth royalty from the well which is producing from their premises, and the order of the board of adjustment, as approved by the judgment of the district court, constitutes a taking of their property without due process of law and is not a proper exercise of the police power, having no relation to public health, morals, safety, or welfare. Defendants contend that, although plaintiffs are entitled to participate in the revenues arising from the producing well, their participation should be charged against the seven-eighths working interest of the Stahl Petroleum Company.

A very similar state of facts was involved in the case of Helmerich & Payne v. Roxana Petroleum Corporation (Kan.) 14 P. (2d) 663. The same contention was made in that case as is made herein. Therein the court said:

"The lease in question reserved to the lessor one-eighth of all oil produced. That left seven-eighths to the lessee. The ordinance provided it should not limit the free right of a lessor to contract for the amount of royalty to be paid with respect to his own land. This provision related to division between lessor and lessee of apportionable production, and not to source or quantity of oil to be divided. In this instance, the lessor's royalty is one-eighth, the same as if the ordinance had not been enacted. The section was not intended to secure to a lessor on whose lots the single well provided for by the ordinance is drilled the stipulated royalty, say one-eighth, computed upon oil drained by the well from lots the lessor did not own, and upon which the owner was prevented from drilling.

"The lessor contends his lease gave him one-eighth of all oil produced by a well

which his lessee drilled on the leased premises, even although the oil produced included oil drained from the one-half block belonging to Kaighn, who was prevented from drilling; that as to the lessor the contract controls, and the ordinance does not apply; that, as to the lessee, the contract controls as between him and the lessor, but the ordinance controls in all other respects; that if Kaighn is to participate in production, the lessee must pay Kaighn out of the lessee's seven-eighths; and that, as a consequence, Kaighn's remedy is on the lessee's bond given when the lessee secured the permit to drill. In support of this contention, it is said the lessee complied with the ordinance, used the lease to procure a permit to drill, gave bond to pay Kaighn, and by utilizing the ordinance, secured certain financial advantages, such as relief from drilling offset wells.

"The lessor's interpretation of the ordinance is manifestly unsound. It would be queer if the ordinance did not affect the lessor at all, but did apply to the lessee. That the ordinance did not do this is demonstrated by the provisions authorizing other lessees, and owners of unleased lots, to tie into the well and become part owners of it with the permittee lessee, by bearing proportionate shares of the cost of drilling and expense of operating the well. Both lessee and lessor were obliged to accept the situation resulting from enactment of the ordinance, and the lessee used the lease to obtain a permit, not merely for his own benefit, but also for the purpose of securing to the lessor whatever accrued to the lessor under the ordinance.

"The ordinance applied to the production of oil from block 85, and other blocks in the city. It took account of the equal right of all lot owners to tap the pool beneath the city; it checked the mad rush to get not only the oil beneath a lessor's land, but as much as possible of the oil beneath the land of other owners and stopped the confounding of confusion in the city by eliminating wasteful necessity of drilling offset wells; and it in effect secured to every lot owner in a block the customary lessor's royalty on that proportion of the oil beneath the block which the surface area of his part of the block bore to the surface area of the block."

Defendants contend that their contractual rights have been invaded by the administration of the ordinance. The contract relied upon, which is the oil and gas lease, provides for the delivery to the lessor of one-eighth of all oil produced and saved from the leased premises. Defendants are contending not only for the one-eighth of the oil produced from their lands, but also

for one-eighth of all the oil drained by said well from plaintiffs' lands, for there was a finding by the board of adjustment, which has gone unchallenged, to the effect that the well, at the location designated, would drain the entire area of the block as nearly equally as possible and at the same time equalize drainage against offset wells.

In this state it is recognized that oil and gas, while in the earth, are susceptible of only a qualified ownership. Rich v. Doneghey, 71 Okla. 204, 177 P. 86, 3 A. L. R. 352; C. C. Julian Oil & Royalties Co. v. Capshaw, 145 Okla. 237, 292 P. 841; Cuff v. Koslosky, 165 Okla. 135, 25 P. (2d) 290. The case of Marrs v. City of Oxford, 24 Fed. (2d) 541, appeared to the Circuit Court of Appeals of the 8th Circuit and affirmed, 32 Fed. (2d) 134, petition for writ of certiorari denied by the Supreme Court of the United States, 280 U. S. 573, 50 S. Ct. 29, 74 L. Ed. 625, settled the right of a municipality, under proper delegated authority from the Legislature, to regulate and control town lot drilling. The purpose and effect of such ordinances is discussed by the Circuit Court of Appeals in Marrs v. City of Oxford, 32 Fed. (2d) 134, 67 A. L. R. 1336, as follows:

"But looking to the substance of things, as equity does, what are the rights of plaintiffs that will be encroached upon or denied to them by the enforcement of this ordinance? It is not the mere right to drill a well on one or two lots at great cost and stop with that, or to take the proportionate part of the oil and gas in the pool that might be said to lie under or be fairly attributed to those lots. The obvious purpose was to reach the pool as quickly as possible and take all of the oil and gas obtainable before others could get it, thus seriously encroaching upon and probably destroying the same rights of adjoining lot owners. If one or more lot owners have given a lease for which no permit is obtainable, their lessee may join a lessee who has a permit in the same block on terms that are fair to both lessor and lessee. If a lot owner has not given a lease, he is protected by the asking in a fair proportion of the mineral produced by a permittee. The regulations make every effort to protect, rather than destroy rights. They extend equal opportunity to all who have an interest and eliminate the race between those having equal rights in a common source of wealth, so that some may not take all and leave others with nothing. Under the law in Kansas there is no property in oil and gas, because of their migratory nature, un-

til they have been captured, though each surface owner may take without limit, unless lawfully restrained. Phillips v. Springfield Crude Oil Co., 76 Kan. 783, 92 P. 1119; National Supply Co. v. McLeod, 116 Kan. 477, 227 P. 350. This is the rule also in Pennsylvania and Indiana. The nature of this right was fully discussed and defined in Ohio Oil Co. v. Indiana, 177 U. S. 190, 44 L. Ed. 729, 20 S. Ct. 576. The court in that case, after accepting the general practice as a settled principle, that every owner of the surface within a gas or oil field might prosecute his efforts and reduce to his possession if possible all of the deposits without violating the rights of other surface owners, in the absence of regulations to the contrary, said: 'But there is a co-equal right in them all to take from a common source of supply, the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right, to the detriment of the others, or by waste by one or more, to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment by them, of their privilege, to reduce to possession, and to reach the like end by preventing waste'."

It has been previously held that the city of Oklahoma City has the power under chapter 178, S. L. 1923, to regulate and restrict, within the city limits, the development and production of oil and gas, and that ordinance No. 3944 is a valid exercise of the police power of the city granted by the provisions of said chapter. Gant v. Oklahoma City, 160 Okla. 62, 15 P. (2d) 833. Contract and property rights are held subject to a fair exercise of the police power. Marrs v. City of Oxford, supra; Crowley v. Christensen, 137 U. S. 86, 11 S. Ct. 13, 34 L. Ed. 620; Home Bldg. & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231.

We find no error in the judgment of the trial court, and the same is affirmed.

McNEILL, C. J., and RILEY, BAYLESS, BUSBY, WELCH, CORN, and GIBSON, JJ., concur. PHELPS, J., absent.